J-A15013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 141 WDA 2022 |

Appeal from the Order Entered December 20, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000027-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 142 WDA 2022 |

Appeal from the Order Entered December 20, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000025-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 143 WDA 2022 |

Appeal from the Order Entered December 20, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000026-2021

BEFORE: BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:                **FILED: SEPTEMBER 22, 2022**

L.T ("Mother") appeals from the December 20, 2021 orders involuntarily terminating her parental rights to two daughters, Ja.L. and Jo.L.[1], and a son, J.B. We affirm.[2]

Mother is a Kenyan immigrant and has no family in the United States. J.B., Ja.L., and Jo.L. were born in the United States in December 2010, June 2013, and October 2014, respectively.[3] The Allegheny County Office of Children, Youth and Families ("OCYF") has had extensive involvement with the family since 2016, when the juvenile court issued an emergency protective custody order removing the children from Mother's care due to Mother's mental health, homelessness, substance abuse, and domestic violence. The juvenile court initially adjudicated the children dependent on January 11, 2017, but within six months, it closed the dependency cases based upon Mother's substantial compliance with the permanency plan and progress toward alleviating the underlying circumstances which necessitated the original placement.

_____

[1] The orphans' court also terminated the parental rights of J.E.L., the individual that Mother identified as the father of Ja.L and Jo.L. Although J.E.L. participated in the evidentiary hearing, he did not appeal the order terminating his parental rights.

[2] This Court consolidated Mother's appeals *sua sponte*.

[3] J.B.'s father, A.B., died on May 19, 2015.

The orphan's court succinctly summarized the ensuing history as follows:

> Less than two years after the initial case closed, Mother and her children again came to the attention of OCYF. The children were removed from Mother for a second time on February 3, 2019, via an Emergency Protective Custody Order. OCYF Caseworker, Tiffany Haten, testified that this removal occurred when Mother "called 911 several times asking the police to come to her home to party" during the Super Bowl. [N].T. 11/19/21 at 32-[3]3. Ms. Haten testified that when the police arrived, "Mother was highly intoxicated and her responses to the police went from flirtatious to combative." Mother refused to allow the police to use her phone to locate a friend or family to come care for the children, all of whom were with Mother at the time. *Id*. Consequently, Mother was charged with three counts of endangering the welfare of children. The police transported Mother to Jefferson Hospital, where she had a physical and verbal encounter with hospital personnel, and received additional charges of aggravated assault and harassment. Mother was incarcerated on the charges and the children were taken into protective custody.
>
> The sisters, Ja.L. and Jo.L., were placed in the same foster home that all of the children had been in during their previous time in foster care and J.B. was placed by himself in a separate home. The children were adjudicated dependent again pursuant to 42 Pa.C.S. § 6302(1) on March 6, 2019. At the time of adjudication, this Court found that Mother was incarcerated, had immigration concerns, and "had a drug and alcohol assessment at the jail that recommended long term in patient treatment." Order of Adjudication dated April 6, 2019. This Court further found that "[J.B.] and [Ja.L.] do not wish to visit mother at this time." *Id*.

Trial Court Opinion, 3/8/22, at 4-6 (cleaned up) (some citations to the record omitted). All three children have remained in the same pre-adoptive foster home since January 31, 2020.

Mother's goals under the family service plans ("FSP") included addressing her drug and alcohol abuse, mental health problems, and

- 3 -

parenting deficiencies.  In addition, she was required to maintain adequate housing and satisfy the medical, therapeutic, and developmental needs of the children.  As Mother was concerned that in-patient substance abuse treatment would impair her employment and consequently place her immigration status in jeopardy, the juvenile court directed Mother to undergo a drug and alcohol evaluation to determine an alternative treatment option.  The court also directed Mother to participate in coached supervised visitations with the children.

Mother had seven permanency review hearings throughout the course of this case which took place from May 22, 2019 through August 4, 2021.  The orphans' court summarized the sporadic ebb and flow of Mother's progression during this period as follows:

> Mother accomplished moderate compliance with the permanency plan, but achieved minimal overall progress.  This court found that Mother's therapeutic visitation with her son, J.B., had ended in June because of Mother's inconsisten[t participation], that she had attended only five out of 35 drug and alcohol screens and one of those screens had been positive for THC, that she did not have independent housing but was staying with a friend, and that while Mother's visitation with her daughters, Ja.L. and Jo.L., was fairly consistent overall [and] visits went okay, there were still concerns that [M]other gets easily frustrated with the children. There have been several instances where [M]other is late to visits or she leaves the visits to go get food for the kids.

*Id*. at 8-9 (cleaned up) (quotation marks and citation omitted).

On February 1, 2021, OCYF filed petitions to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  The orphans' court appointed separate counsel to represent the distinct

legal interest of each of the children. During the ensuing evidentiary proceedings over a video conferencing platform, OCYF presented, *inter alia*, the testimony of Neil Rosenblum, PhD, who evaluated the family on four occasions since 2017, Tiffany Haten, the OCYF caseworker assigned to the family since 2019, Laura Burlbaugh, the Pressley Ridge caseworker responsible for scheduling and supervising the visitations, Mary Safran, a prevention specialist with Family Resources, and K.W., the pre-adoptive foster mother who has cared for the children for more than two years. Finally, the agency introduced several exhibits including, *inter alia*, Dr. Rosenblum's four evaluation reports, the most recent dated July 31, 2021, which the orphans' court admitted without objection.

Mother testified and presented the maternal grandmother, who has never visited the United States but provides Mother emotional and financial support from Kenya.

On December 20, 2021, the orphans' court terminated Mother's parental rights to the three children. Mother filed notices of appeal from the involuntary termination orders and simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[4] The orphans' court issued its Rule 1925(a) opinion on March 8, 2022.

Mother presents the following questions for our review:

---

[4] The orphans' court granted Mother leave to file the appeals *nunc pro tunc*.

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Children pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 8. J.B.'s counsel filed a brief in support of the termination of Mother's parental rights. We note with disapproval that neither counsel for Jo.L. nor counsel for Ja.L. filed a brief advocating their respective client's legal interest in this appeal.

In reviewing Mother's two issues, we must determine whether the orders are supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Simply put, "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion

"only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra* at 1123–1124.

The involuntary termination of parental rights requires a bifurcated analysis. 23 Pa.C.S. § 2511. The orphans' court must initially determine whether the conduct of the parent warrants termination under § 2511(a). Only if the court determines that the petitioner established grounds for termination under § 2511(a) does it then engage in assessing the petition under § 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both § 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, *supra* at 359 (*quoting Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

We need only agree with any one subsection of § 2511(a), along with § 2511(b), to affirm the termination of parental rights. *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*) (citation omitted). In this case, we analyze the orders pursuant to § 2511(a)(2) and (b), which provide as follows.

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . . .

23 Pa.C.S. § 2511(a)(2), (b).

The grounds for termination of parental rights under § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct and may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (citation omitted). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available

- 8 -

services during the dependency proceedings. *In re S.C.*, *supra* at 1105 (citation omitted).

In determining that OCYF presented clear and convincing evidence to establish the statutory grounds to terminate Mother's parental rights, the orphans' court highlighted that Mother is incapable of providing essential parental care to the children, as highlighted by her inability to comply with the FSP goals relating to her mental health problems, substance abuse, parenting, housing, and visitation, or make significant progress toward reunification. In sum, the orphans' court reasoned,

> Mother's failure to comply with the goals set for her by OCYF and this [c]ourt or to even make significant progress on those goals constituted "repeated and continued incapacity" to parent her children and that that incapacity "cannot or will not be remedied" as required by subsection (a)(2). Further, [noting that] the children had been out of Mother's care for approximately 24 consecutive months at the time the petition was filed and 34 months at the time of the termination hearings . . . this [c]ourt acknowledges [that] Mother began to make some incremental improvements after the filing of the petition to involuntarily terminate Mother's parental rights. The Superior Court has been clear that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future." *In the Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Therefore, this [c]ourt concluded that due to Mother's lack of progress on her goals that it is, regrettably, not possible that the conditions which led to the children's removal will be remedied in a reasonable period of time.

Trial Court Opinion, 3/8/22, at 22-23.

Mother contends that the orphans' court erred in finding that OCYF presented clear and convincing evidence that Mother failed to remedy the conditions that led to the children's removal, which she limits to the intoxication which led to her arrest. Mother's brief at 19-20. Mother ignores the effect of her mental health problems on her struggles with substance abuse. She continues that the orphans' court overlooked her progress in substance abuse treatment in reaching the contrary finding that she cannot remedy the underlying conditions. *Id*. at 20-21. The crux of Mother's argument is that the court placed too much weight upon Dr. Rosenblum's expert assessment that Mother tended to minimize her substance abuse. *Id*. at 21-23. Instead, Mother relies upon her own testimony to bolster her claim that "she has made efforts to remedy the conditions that led to the removal of the children." *Id* at 22. In addition, noting that OCYF permitted J.B. to dictate his participation in therapeutic visitation, and conveniently ignoring evidence establishing her parenting deficiencies in relation to the two younger children, Mother challenges the court's consideration of her lack of progress toward reunification. *Id*. at 23.

The certified record belies Mother's contentions. First, Mother's characterization of the conditions that led to the children's removal is too narrow. While Mother's acute intoxication triggered the emergency protective custody order, it was not the sole cause of her incapacity. Actually, various deficiencies concerning mental health, substance abuse, housing, and

parenting contributed to the removal of the children, and the agency fashioned goals to address those specific conditions. Furthermore, as the orphans' court highlighted in its Rule 1925(a) opinion, Mother failed to make consistent progress toward these goals and in attending visitations with the children. We address Mother's efforts as to these components *seriatim*.

As to mental health, the orphans' court reasoned that until immediately before the filing of the underlying petition to terminate her parental rights, Mother's compliance with her mental health treatment regimen was inconsistent with Dr. Rosenblum, the court-appointed evaluator, describing a poor prognosis of improvement. Hence, the court determined that "Mother had not sufficiently met her mental health treatment goal, her lack of compliance directly impacts her ability to parent her children, and she is unlikely to remedy this condition in the foreseeable future." Trial Court Opinion, 3/8/22, at 17.

We agree with the orphans' court's rationale. During the evidentiary hearings, Dr. Rosenblum confirmed that Mother periodically engaged in mental health treatment during the dependency proceedings, but failed to participate in any consistent course of treatment. N.T., 11/19/21, at 84. Mother has been diagnosed with, *inter alia*, alcohol use disorder, adjustment disorder, and personality disorder with antisocial, histrionic, and narcissistic features. *Id*. at CYF Exhibit 4. However, when Dr. Rosenblum pressed Mother about the specific goals of her mental health treatment, she informed him that

the goals "were largely just to get her children back." *Id*. As Dr. Rosenblum explained, "that is not really a mental health goal." *Id*. Indeed, he found that Mother's glib response indicates that she is not "using mental health treatment to understand the concerns about her lifestyle, the concerns about her inability to function effectively as a parent, [and] the excesses and impulsivity in her behavior. Th[ese areas of concern were] consistently missed by Mother." *Id*. As Mother could never identify what aspect of her mental health she was supposed to be treating, Dr. Rosenblum had the impression that Mother was simply going through the motions of treatment in order to appease her OCYF caseworker. *Id*. In sum, he opined, "there has not been an ability to utilize treatment effectively because there is a very limited ability to recognize and take ownership of the problems that have lead to her children to now be in care over an extended period of years." *Id*. Phrasing this concept differently, Dr. Rosenblum observed, "[a]ttending treatment and benefitting from the treatment are two very different things." *Id*. at 85. Hence, the record supports the orphans' court's finding that, despite her improved attendance at treatment, Mother cannot or will not remedy her mental health problems.

Next, as to Mother's substance abuse problem, the orphans' court highlighted Mother's minimization of her substance abuse, failure to attend all but five of urine screens scheduled since 2019, and the fact that one of the few urine samples that she actually submitted tested positive for THC. Thus, the orphans' court determined, "Mother does not fully appreciate the impact

[that] her substance abuse has had on her children and that her lack of understanding may lead to a relapse and repeated behavior if the children were returned to her care." Trial Court Opinion, 3/8/22, at 16. The certified record sustains the orphans' court's concerns.

Tiffany Haten, the OCYF caseworker, testified that based upon mother's history of substance abuse and the alcohol-related events that triggered the agency's involvement with the family in 2019, Mother was directed to address her drug and alcohol problems as a qualification of reunification. N.T., 11/19/21, at 181. Mother initiated treatment in a dual diagnosis treatment program, but was quickly discharged in February 2019. *Id*. at 184-85. She claimed to have engaged in a subsequent dual diagnosis program but Ms. Haten was never able to verify Mother's participation. *Id*. at 185-86. Mother started individual drug and alcohol therapy on August 6, 2020, approximately six months before OCYF filed the underlying petition, and attended approximately fifty-three of sixty-two sessions. *Id*. at 187.

Notwithstanding Mother's eventual participation in this aspect of her treatment, she not only failed to demonstrate any progress but she also established a pattern of minimizing her problem with drugs and alcohol. Similar to his description of Mother's efforts to address her mental health concerns, Dr. Rosenblum testified that Mother was simply going through the motions to appease OCYF. *Id*. at 84. Rather than confront her substance abuse problems, Mother consistently informed Dr. Rosenblum that she did not

have a problem and questioned why drug treatment was necessary. ***Id***. Again, Dr. Rosenblum opined, "to utilize treatment effectively[,] one has to acknowledge what the problems are that you are working on. I have never been able to identify that with Mother over a period of years." ***Id***. at 85.

Mother's minimization of her substance abuse problem is most clearly exemplified by her utter disregard for the court-ordered urine screens. Indeed, Ms. Haten confirmed that Mother attended only five of the forty-two urine screens schedule since the case was reopened in 2019. ***Id***. at 189-90. Of the five samples submitted, Mother once tested positive for THC, which she attributed to her close contact with people who regularly ingested medical marijuana. ***Id***. at 190; N.T., 12/16/21, at 128. As the certified record supports the orphans' court's determination that Mother failed to appreciate the impact of her substance abuse upon J.B., Ja.L. and Jo.L., we do not disturb it.

Mother also neglected her goals relating to housing, parenting, and visitation. First, as to the housing component, Mother testified that she still has not secured stable housing for the family. ***Id***. at 87-88. In fact, at the time of the evidentiary hearing, she was living in temporary housing that was inappropriate for the children. ***Id***. at 131-32. Although Mother claimed that her compliance with the housing component was imminent, the orphans' court exercised its discretion, as the ultimate arbiter of fact, to reject that assertion.

In relation to Mother's parenting and visitation with J.B., Ja.L. and Jo.L., Ms. Haten testified that Mother was twice discharged from parenting classes. N.T., 11/19/21, at 193. While Mother ultimately completed a parenting class at Family Resources, her instructor, Mary Safran, testified that Mother did not employ the information properly during the coached supervised visitations with the children. *Id*. at 129, 148-49. Ms. Safran described several instances that highlighted her ultimate position that Mother is immature, elevates her feelings over the children's, and is unable to recognize her children's needs without guidance and redirection. *Id*. at 135-37, 146-147, 149. One incident involved Mother focusing her attention on her own concerns rather than assisting the children with homework. *Id*. at 147. Another example concerned Mother's inability to be truthful with the children about her housing situation and providing a false sense of hope by placing the blame on OCYF. *Id*. at 148. The most representative episode required Ms. Safran to terminate Mother's visitation with Ja.L. and Jo.L. after Ms. Safran approached Mother about speaking on the phone in the hallway for nearly ten minutes during the visitations. *Id*. at 153. Ms. Safran explained that, having previously advised Mother she should not utilize her telephone during the supervised visitations, "I waited over ten minutes and went out in the hallway and I asked her if there was anything that I could [do to] help and she just [went] ballistic[.]" *Id*. In sum, Ms. Safran opined that Mother remains incapable of recognizing the children's feelings without redirection and that unsupervised visitation still

is not recommend. *Id*. at 148-49. Critically, Ms. Safran's concerns about Mother's parenting aligned with Dr. Rosenblum's assessment: "I don't doubt that [M]other loves the children, but her immaturity, her impulsivity and her poor decision-making . . . prevent[ed the] children from developing a sense of security and stability and a sense of being centered in their life, which they do now have." *Id*. at 87-88.

Having discussed the nature of Mother's interactions with the children as it relates to her parenting, generally, we separately address Mother's attendance during the supervised visitations. First, as to J.B., Mother and J.B. had separate therapeutic visitations, which were scheduled to occur at TRAC Services for Families at the child's discretion. *Id*. at 195. J.B. initially agreed with the therapeutic visitations; however, TRAC closed services after J.B. grew frustrated with Mother's inconsistent attendance and refused to participate. *Id*. at 210-11. Throughout the duration of this juvenile court matter, Mother attended five in-person visits with J.B., five virtual visits, and one therapeutic visit through TRAC. *Id*. at 53-54. J.B. has not attended a supervised visitation with Mother since April 2021—two months after OCYF filed the petition to terminate Mother's parental rights. N.T., 12/16/21, at 41.

Ms. Haten outlined Mother's visitation schedule with the two younger children as follows. Initially, Mother was granted two supervised visitations per week. N.T., 11/19/21, at 196. During the COVID-19 pandemic, one of the weekly visitations was virtual. *Id*. However, the virtual visitations were

- 16 -

subsequently terminated due to Mother's lack of attention to Ja.L and Jo.L. during the sessions. *Id*. As described by Ms. Haten, "Mother would be nodding off during the visits . . . talking to others in the background and . . . rush[ing] the children off the visit because she was planning to go out[.]" *Id*. at 197. Thus, while Mother's attendance at visitations with Ja.L and Jo.L. was relatively consistent, because of Mother's behavior and lack of development, the visits never progressed beyond one supervised visitation per week. *Id*.

In light of the foregoing evidence, we discern no basis to upset the orphans' court's conclusion that, for three years, Mother failed to achieve her goals as to mental health, substance abuse, parenting and visitation and that she is not likely to complete those components within a reasonable time. Phrased differently, Mother's persistent incapacity has caused J.B., Ja.L., and Jo.L. to be without the essential parental control necessary for their physical and mental well-being. Hence, the orphans' court did not err or abuse its discretion in finding that OCYF proved by clear and convincing evidence the statutory grounds to terminate parental rights pursuant to § 2511(a)(2).

Next, having found that the certified record supports the orphans' court's determination pursuant to § 2511(a), we review the court's needs-and-welfare analysis to determine whether the orphans' court gave "primary consideration to the developmental, physical and emotional needs and welfare of" J.B., Ja.L., and Jo.L. in terminating Mother's parental rights. 23 Pa.C.S. § 2511(b). With respect to § 2511(b), this Court has stated that the orphans'

court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010).

Our Supreme Court has explained, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

Once more, Mother argues that the record is not sufficient to support the orphans' court's determination. Specifically, she asserts that she has unique relationships with each of the children that is centered on their Kenyan heritage and culture, which she believes are best served by maintaining her parental rights. Mother's brief at 24-25. Again, no relief is due.

Relying upon Dr. Rosenblum's expert testimony, the orphans' court determined that terminating Mother's parental rights best served the developmental, physical and emotional needs and welfare of all three children. Specifically, the court first observed that eleven-year-old J.B. "no longer ha[s] a primary attachment to Mother," and since the initiation of the case in 2019, J.B. has consistently and repeatedly stated his desire to be adopted. Trial Court Opinion, 3/8/22, at 23. As to the younger children, the court found that, despite having a rapport with Mother, termination served the needs and welfare of Ja.L. and Jo.L. because both children are benefiting from their experiences in the foster home and "any impact on the children if [Mother's] right[s] were terminated would be mitigated by the strong support and love the children received in their foster home." *Id*. at 25. The court essentially adopted Dr. Rosenblum's conclusion that "after two years[,] it appears that a goal of adoption is the only . . . outcome that can provide the girls with a stable and secure family life that they can depend on through the duration of their childhood and adolescent years." *Id*. (quoting OCYF Exhibit 4). As explained *infra*, the certified record supports the orphans' court's determination.

In relation to J.B., Dr. Rosenblum testified the termination of Mother's parental rights would not be detrimental to J.B. N.T., 11/19/21, at 93. He noted that J.B. "has essentially already severed th[e] emotional bond" with Mother and he unequivocally endorses adoption. *Id*. at 124-25. In fact,

Dr. Rosenblum believed that it would be more detrimental to J.B. if he were removed from the current pre-adoptive foster home. *Id*. at 125-26. Dr. Rosenblum agreed in his "professional opinion to a reasonable degree of psychological certainty that the benefit to [J.B.] of termination is substantial and the loss or the detriments to [J.B.] of termination is minimal[.]" *Id*. at 125. Hence, we discern no error in the orphans' court's conclusion that terminating Mother's parental rights serves J.B.'s needs and welfare.

Similarly, as to the younger children, Dr. Rosenblum testified in favor of adoption within a reasonable degree of psychological certainty. *Id*. at 115, 126. He noted that Mother did not display the characteristics of trust, safety, security, sound judgment, and supervision. *Id*. at 91. Generally, he explained,

> [J.B.] and the girls have really benefited from the opposite of what they experienced with their mother. They have a stable family life, they go to the same school, they have activities that they participate in, they have consistent discipline and structure and their needs are being very well met.

*Id*. at 87.

Relating to the severance of the parent-child bonds, Dr. Rosenblum observed, "the girls will miss their mother, but they also have developed very healthy, strong attachments to the foster parents." *Id*. at 92. He continued, "the girls certainly relied on their foster parents to meet their emotional and developmental needs to a greater extent -- a far greater extent than they rely on their mother," who "has been reduced to a once a week visitor for close to

three years[.]" *Id*. In contrast, as a periodic playmate, Mother is not viewed by the children as someone who will protect them or "guide them in a secure direction." *Id*. In sum, Dr. Rosenblum concluded, "I believe that the girls will be sad, but I don't believe that it will cause them severe or irreparable harm." Critically, he observed that any impairment can be addressed gradually in therapy. *Id*.

Dr. Rosenblum's conclusion is consistent with the testimony of other witnesses concerning the girls' desire to be adopted. In this vein, Ms. Safran testified that Ja.L. and Jo.L. are happy and thriving in their placement and ask her "when they are [going to be] adopted." *Id*. at 199. Ja.L.'s yearning for adoption is plain. *Id*. at 216, 219-20. While Jo.L. sometimes equivocates, she is anxious for the ordeal to end. *Id*. at 216-17. Likewise, the pre-adoptive foster mother testified that all three children wish to be adopted, even though the younger girls prefer to maintain some form of post-adoption contact with Mother. N.T., 12/16/21, at 39-41. Although the foster mother did not explicitly assent to continued contact, she agreed that she is best suited to assess "whether or not [the children should] have ongoing contact with [M]other" following the adoptions. *Id*. at 39, 41.

Thus, as demonstrated by the foregoing evidence, the certified record supports the orphans' court's finding that severing the existing parental bonds would not be detrimental to the children and that the developmental, physical and emotional needs and welfare of J.B., Ja.L., and Jo.L. favor terminating

- 21 -

Mother's parental rights. Accordingly, based upon our review of the record, we find the orphans' court did not abuse its discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2022